**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES D. BUNTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:09CV1914MLM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION</u>**

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael Astrue ("Defendant") denying the application for Supplemental Security Income under Title

XVI of the Social Security Act, 42 U.S.C. § 401, 1381 et. seq., filed by Plaintiff James D. Bunton

("Plaintiff"). Plaintiff filed a Brief in Support of the Complaint. Doc. 23. Defendant filed a Brief in

Support of the Answer. Doc. 27. The parties have consented to the jurisdiction of the undersigned

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc.7.

**I.**
**PROCEDURAL HISTORY**

On August 10, 2005, Plaintiff filed an application for SSI, alleging a disability onset date of

August 8, 2005. Tr. 48-54. Plaintiff's claim was denied on September 9, 2005, and he filed a request

for hearing before an Administrative Law Judge ("ALJ"). Tr. 23, 40-45. A hearing was held before

an ALJ on October 4, 2006. Tr. 204-16. By Decision dated December 17, 2006, the ALJ found

Plaintiff not disabled through the date of the decision. Tr. 147-54. The Appeals Council granted

Plaintiff's request for review and remanded the matter for further consideration and evaluation. Tr. 168-71. A second hearing was held before an ALJ on June 20, 2007. Tr. 217-32. By decision, dated November 4, 2007, the ALJ found Plaintiff not disabled. Tr. 11-22. The Appeals Council denied Plaintiff's request for review of the November 4, 2007 decision of the ALJ. Tr. 2-4. Thus, the November 4, 2007 decision of the ALJ stands as the final decision of the Commissioner.

## II.
## MEDICAL RECORDS

John S. Pearson, D.O., of St. John's Clinic, Rolla Medical Group, ("St. John's Clinic") examined Plaintiff on May 31, 2005. Dr. Pearson noted on this date that Plaintiff reported having two seizures in the last week; that Plaintiff "had a little chest pain" during the seizures; that Plaintiff experienced a "postictal phase"; that "during these times," Plaintiff became very sweaty, very weak, and experienced throbbing in both legs at times; that, with the exception of his two recent seizures, Plaintiff had not had a seizure for two years; that Plaintiff had been switched from Neurontin to valproic acid while in jail and that Plaintiff "really could not tell any difference"; that Plaintiff had a history of low back problems; that Dr. Pearson suspected that "some degree of reflux" was causing Plaintiff's chest pain; that Dr. Pearson prescribed Zantac for Plaintiff; and that Plaintiff's distal neurologic and neurologic evaluations were "completely normal." Tr. 110.

On June 6, 2005, Plaintiff had an EEG. Tr. 102. Sudhir Batchu, M.D., M.S., reviewed Plaintiff's EEG and noted Plaintiff's EEG showed "a background of 8-9 CPS activity posteriorly and low amplitude faster activity anteriorly"; that "[r]are synchronous and asynchronous positive sharp discharges were seen from both hemispheres in focal and generalized distribution"; that "[p]aroxysmal slowing was seen from posterior areas with poor reproduction"; that there were "[n]o spike and slow

complexes"; that "[n]o focal or diffuse slowing was seen"; that "[n]o periodic or pseudo-periodic activity was recorded"; that Plaintiff's "[c]ardiac monitoring was in [the] normal range"; that Plaintiff's EEG was abnormal and consistent with a possible seizure disorder; and that Dr. Batchu recommended "[c]linical correlation." Tr. 102.

On June 14, 2005, Dr. Pearson reported that Plaintiff had not kept his appointment that was scheduled for that date. Tr. 109.

Dr. Pearson saw Plaintiff on November 15, 2005 and noted that Plaintiff "never made it to Neurology because of his incarceration"; that a neurology appointment was made for November 17, 2005 and "he [wa]s instructed to keep it"; that Plaintiff's existing lower back pain "ha[d] become increasingly severe"; and that Plaintiff's difficulties with restless leg syndrome were "settling down quite nicely with the Requip." Dr. Pearson further noted that Plaintiff's lower extremities strength testing was equal and symmetric; that Plaintiff's distal sensation was fully intact; that Plaintiff's pulses were intact; that Plaintiff's "[c]ap refills" were good; that Plaintiff's deep tendon reflexes were intact, appropriate, and symmetric; that "[h]eel walking [wa]s achieved with some difficulty, but he [wa]s able to finally maintain his balance"; that Plaintiff's "[s]traight leg raising sign [wa]s negative and yet the patient has a great deal of difficulty with toe walking" and could not maintain his balance with "toe walking"; that Plaintiff suffered from a seizure disorder, lower back pain, and restless leg syndrome; and that Plaintiff "otherwise appear[ed] to be stable." Tr. 103.

An x-ray of Plaintiff's lumbar spine on November 15, 2005, evaluated by Don Huddleston, D.O., showed that "AP and lateral projections of the lumbar spine demonstrate[d] no evidence of fracture"; that Plaintiff's disc spaces were preserved; that there was no listhesis; and that Dr. Huddleston's impression was of a "[n]ormal bony lumbar spine." Tr. 104.

Plaintiff underwent a consultation on November 17, 2005, at Rolla Neurology Pain and Sleep Center. M. Akhtar Choudhary, M.D., noted that Plaintiff "sa[id] he used to have seizures everyday"; that Plaintiff stated that his seizures decreased in frequency after the age of 13 to "one a month or maybe every other month"; that Plaintiff's last seizure was on October 3, 2005; that Plaintiff took Depakote for eighteen years and stopped taking it three to four months prior; and that since stopping his Depakote, Plaintiff said "he d[id] not feel any difference." Tr. 96.

Dr. Choudhary also noted that Plaintiff stated he had suffered from headaches for the last ten years; that the headaches had "increased progressively" to two to three headaches a week; that Plaintiff described pain "mainly in the occipital region radiating to the top"; that Plaintiff described the pain as a "dull ache"; that Plaintiff "[g]raded his headache 7-8/10"; that Plaintiff's severe headaches were "accompanied with nausea"; that Plaintiff had a history of "photophobia and phonorphobia with the headache"; and that Plaintiff's medical history was "[s]ignificant for high blood pressure, migraine headaches, restless leg syndrome, head injury and seizures." Tr. 96.

Further, Dr. Choudhary noted that Plaintiff smoked a half a pack of cigarettes a day, historically drank once a month, and denied using drugs; that Plaintiff took Requip at bedtime; that Plaintiff had no allergies; that, in review of Plaintiff's systems, Dr. Choudhary noted "sleep problems, wears glasses, sinuses, neck pain, stiff neck, emphysema, shortness of breath, fever, heartburns, muscle pain, back pain, numbness, tingling, fainting, depression, [and] nervousness"; and that Plaintiff "d[id] not seem to be in any acute distress." Dr. Choudhary also reported, upon examination, that Plaintiff was awake, alert, and oriented to time, place, and person; that Plaintiff's pupils were reactive and "[e]xtraocular eye movements [were] intact"; that Plaintiff's muscle tone was normal and his muscle strength was "5/5" in all extremities; that Plaintiff's "[d]eep tendon reflexes upper extremity+2

lower extremity+1"; that Plaintiff's gait was normal; that a CT of Plaintiff's head from July 31, 2003 was "normal"; that Plaintiff "most likely seemed to have" Generalized Tonic Clonic Seizures; and that Dr. Choudhary planned to start Plaintiff on Fioricet with codeine for his headaches and on Dilantin. Tr. 97-98.

In response to Interrogatories, Dr. Choudhary stated, on March 1, 2006, that he diagnosed Plaintiff with a seizure disorder and migraine headaches; that Plaintiff had "Generalized Tonic clonic type" seizures; that the frequency of Plaintiff's seizures was "[v]ariable may be once a month or every other month"; that Plaintiff could "be tired and sleepy after [a] seizure for couple of hours or some time longer"; and that Plaintiff should lie in a dark room "only during [a] migraine attack." Tr. 94-95.

Records signed by Amy Whitaker, RN, CS, FNP, of St. John's Clinic, reflect that Plaintiff visited the clinic on March 2, 2006 complaining of "congestion for about a week, right ear ache, some tooth ache, coughing, [and] headache"; that Nurse Whitaker assessed Plaintiff's concerns as sinusitis and chronic pain; that toward the end of the visit, Plaintiff stated "that the change in medication that Dr. Pearson made did not work and he [Plaintiff] wanted Vicodin"; that when Nurse Whitaker explained that Dr. Pearson was sick and that she was not able to prescribe the Vicodin, Plaintiff "became very mad"; that Plaintiff said he was "suffering"; that Plaintiff wanted Nurse Whitaker to call Dr. Pearson; that Plaintiff "did not want" Nurse Whitaker's prescription for Augmentin; and that Plaintiff said he was "going to get a new doctor." Tr. 93.

A record signed by Nurse Whitaker, dated March 7, 2006, reflects that Plaintiff did not keep an appointment he had scheduled for that day. Tr. 92.

On July 6, 2006, Plaintiff was seen by Laura L. Brenner, Ph.D., for a psychological evaluation upon referral from Plaintiff's attorney. Dr. Brenner reported that Plaintiff was "physically abused"

as a child; that Plaintiff "ha[d] a family history of unspecified mental illness leading to disability in his father and one of his sisters"; that Plaintiff completed ninth grade in school; that Plaintiff was placed in "specialized education" and exhibited behavior issues in school; that Plaintiff was unemployed and had not worked for two years; that Plaintiff's most recent job was in construction; that he was fired from that job "after having a seizure on the job"; that Plaintiff's longest-held job was as a mechanic for two and a half years twenty years ago; that Plaintiff was fired from one other job "because he missed work secondary to having a seizure"; that if Plaintiff's supervisors became critical, Plaintiff would become upset; that Plaintiff was "often forgetful, but could learn new information if it was 'hands on'"; that in his past jobs, Plaintiff's concentration was good; that in his past jobs, Plaintiff had "no issues with making mistakes or with keeping up an adequate work pace"; that Plaintiff possessed a valid driver's license that was suspended once for leaving the scene of an accident; that Plaintiff reported that he was "an effective money manager"; and that Plaintiff thought he would be capable of paying bills and managing his money by himself. Tr. 85-86.

Dr. Brenner further reported that Plaintiff listed his health problems as restless leg syndrome, migraine headaches, back problems, and asthma; that Plaintiff's seizure disorder was presently controlled with medication; that Plaintiff had back pain as a result of several car accidents; that Plaintiff had "no known head injuries"; that Plaintiff reported taking Dilantin and Clonazepam; that Plaintiff was not under the care of a mental health professional; that while in prison, Plaintiff participated in a three-month substance abuse treatment program; that after a marital separation in 1992, Plaintiff was briefly hospitalized in a "stress center"; that Plaintiff denied having any other mental health treatment; that Plaintiff's medical records indicated that Plaintiff was diagnosed with "a probable Generalized Tonic Clonic seizure disorder" in childhood; that Dr. Brenner examined no

records from Plaintiff's substance abuse treatment program; and that Plaintiff's school records showed below average skills on standardized tests and no individualized educational plan. Tr. 86.

Dr. Brenner further noted that Plaintiff reported that his "primary impediments to working [were] leg and back pain, frequent migraines, frequent illness in the past two years and depression"; that Plaintiff reported his mood was "pretty good up until about a month ago when he started becoming irritable"; that Plaintiff was upset by his marital separation; that with medication, Plaintiff was sleeping well; that, since his marital separation, Plaintiff's energy had been low; that Plaintiff's appetite had decreased; that Plaintiff was "motivated and able to enjoy himself if he feels up to it physically"; that Plaintiff reported having "memory problems" for the last six years; that Plaintiff was "typically forgetful of daily details"; that Plaintiff focused well at home; that Plaintiff had "a sense of hope for the future"; that Plaintiff denied any suicidal thoughts, "manic or hypomanic symptoms," or "symptoms of psychosis"; that Plaintiff became "physically nervous on a daily basis" in reaction to "obvious stressors" such as arguments; that Plaintiff did not have unpredictable panic attacks; that in the last several years, Plaintiff "gradually bec[a]me more nervous in public places"; that Plaintiff "could not identify any specific fears but is uncomfortable in crowds"; that Plaintiff went to stores and his children's school events, "although he trie[d] to keep trips fairly brief"; and that Plaintiff denied having obsessions, compulsions, or "traumatic memories that affect his functioning." Additionally, Dr. Brenner noted that Plaintiff had a history of "heavy, daily alcohol abuse"; that he had "reduced his consumption in recent years and typically will have about two beers a week"; that Plaintiff had a "binge at the time of his marital separation when he drank about 24 beers"; that Plaintiff had not had any "binges" since that time; that Plaintiff denied using "illicit" drugs; that Plaintiff had difficulty trusting others, "although he could voice no specific concerns"; that Plaintiff denied "problems

controlling his temper"; that when angry, Plaintiff did not become violent; and that Plaintiff denied having homicidal thoughts. Tr. 86-87.

With regard to Plaintiff's daily functioning, Dr. Brenner reported that Plaintiff spent "his days sitting around the house, playing with his dogs, listening to the radio and sitting outside"; that Plaintiff did "well" with his children; that Plaintiff enjoyed fishing "when he [could]"; that Plaintiff could cook; that Plaintiff had difficulty measuring or following recipes; that his "concentration in the kitchen [was] adequate"; that Plaintiff "d[id] the basics" of household chores; that Plaintiff was "attentive to his own hygiene"; that Plaintiff "d[id] not drive often"; that Plaintiff did not get lost in familiar areas; that Plaintiff had difficulty in new locations; that Plaintiff occasionally shopped with his sister and used a list to remember what he needed; that Plaintiff could "find items in familiar stores"; that Plaintiff "[wa]s able to calculate the change owed to him" when he made purchases; that Plaintiff had never paid bills; that Plaintiff thought "that he could do so if needed"; that Plaintiff did not have a checking account; that Plaintiff's reading skills were "'not great'"; that Plaintiff would "have some difficulty reading a newspaper"; and that Plaintiff did not attend any "group activities." Tr. 88.

Regarding Plaintiff's mental status, Dr. Brenner observed that Plaintiff had "dirty fingernails but otherwise seemed clean"; that Plaintiff was "alert and fully oriented to person, date, location and reason for being here"; that Plaintiff's social skills were "intact"; that Plaintiff maintained good eye contact; that Plaintiff was cooperative; that Plaintiff's affect was reserved; that Plaintiff's speech was "logical, relevant and brief"; that Plaintiff had "[n]o pressure of speech or loosening of associations"; that based on "social history, vocabulary and overall reasoning, [Plaintiff's] intellect was estimated to be low-average to borderline retarded"; that Plaintiff's insight and judgment were "commensurate" with Plaintiff's intelligence; that Plaintiff's "[m]emory was generally intact in simple mental status

testing"; that Plaintiff could "recall two of four words after a brief delay and recalled the other two words with cuing"; that Plaintiff could remember "details of his personal history without obvious difficulty"; that Plaintiff's concentration was sufficient "to repeat six digits forward and four backward, which is generally within the normal range"; that Plaintiff's behavior to be "unremarkable"; and that Plaintiff "shifted in his seat in apparent discomfort at times, but otherwise was able to stay seated and focused during a lengthy evaluation." Tr. 88.

Dr. Brenner administered the Wechsler Adult Intelligence Scale-3[rd] Edition (WAIS-III) during her evaluation. Dr. Brenner reported that Plaintiff had a full scale IQ of 75; that Plaintiff had a verbal IQ of 77; that Plaintiff had a performance IQ of 77; that these scores placed Plaintiff in the "borderline-retarded range of intellectual ability"; that Plaintiff's scores on the Similarities subtests suggested a "relative weakness in abstract conceptualization skills"; that Plaintiff's scores on the Arithmetic and Digit Span tests suggested "a relative strength in concentration and basic math skills"; and that Plaintiff's other subtests fell within the expected range given his overall I.Q. scores. Dr. Brenner's diagnostic impression of Plaintif, at Axis I, was Major Depressive Disorder, mild Alcohol Dependence, "sustained partial remission,"; at Axis II, her diagnosis was Borderline Intellectual Functioning; at Axis III, her diagnosis was a Seizure Disorder; at Axis IV, her diagnosis was Plaintiff's recent martial separation; and, at Axis V, her diagnosis was a Global Assessment Functioning ("GAF")[1] of 55. Tr. 88-89.

---

[1] Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

In her July 6, 2006 Report, Dr. Brenner further noted that Plaintiff "appear[ed] to be depressed, particularly in reaction to a recent marital separation"; that Dr. Brenner recommended antidepressant medication and counseling; that Plaintiff was "at risk of having a relapse of his alcohol dependence if stressors in his life increase"; that Dr. Brenner recommended Plaintiff "participate in support groups to aid sobriety"; that Plaintiff "is reporting significant memory problems at home, although he did fairly well today in brief mental status testing"; that "[m]emory testing would provide further specifics of his strengths and weaknesses, if needed"; that individuals with Plaintiff's level of intelligence "can typically be trained to perform simple work tasks independently"; that "complex tasks or those requiring strong academic skills will likely be beyond his ability"; that Plaintiff could "make simple decisions without supervision"; that Plaintiff's problem-solving ability "will be below-average"; that Plaintiff's interpersonal skills were "variable"; that Plaintiff "gets along well with people once he gets to know them, but is nervous initially"; that Plaintiff "withdraws from challenges and becomes nervous around conflict; and that nothing in Plaintiff's test results would preclude him from "managing his funds in his own best interests." Tr. 89-90.

A Patient Card Record, dated November 7, 2006, and signed by Nurse Whitaker, reflects that Plaintiff reported "[b]ad leg cramps"; that Plaintiff was not taking his medication and had not taken seizure medication for two years; that Plaintiff reported having a seizure three weeks earlier; that Plaintiff had "an abnormal EEG this summer but never followed up"; that Plaintiff reported his sleep was poor; that Plaintiff had a history of seizures and restless leg syndrome; and that Nurse Whitaker prescribed a "sample kit" of Requip for Plaintiff. Tr. 108.

Records dated December 11, 2006, from Texas County Memorial Hospital reflect that Plaintiff presented to "[e]stablish care" because he had recently moved; that Plaintiff reported having

"Grand mal" seizures every other day; that Plaintiff reported "severe GI complaints" related to his Depakote medication; that Plaintiff "[r]an out of meds" two months earlier; that Plaintiff complained of migraines, restless leg syndrome, and anxiety and depression in addition to his seizures; that Plaintiff smoked half a pack of cigarettes every day; and that Plaintiff's toxicology report of that day indicated a Dilantin level of zero. Tr. 188-89.

Dr. Pearson's notes of May 7, 2007, reflect that Plaintiff had a seizure three weeks prior to this visit; that Plaintiff reported "feeling bad"; that Plaintiff's "affect" was "depressed and very worried"; and that Dr. Pearson assessed Plaintiff as suffering from fatigue/malaise, dyspnea, and palpitations in addition to seizures. Tr. 186.

On May 18, 2007, in response to interrogatory questions from Plaintiff's attorney, Dr. Pearson stated that he began treating Plaintiff on November 18, 2002; that he had treated Plaintiff for a seizure disorder, migraine headaches, and "multiple episodes of bronchitis"; that "[b]y description," Plaintiff had "generalized tonic/clonic" seizures; and that Plaintiff's reports of feeling "weak and shaky" after a seizure were consistent with a "postictal state" patients experience after generalized tonic/clonic seizures; and that one to two seizures per week "is what the patient reports but he's only been seen 4 times within the last 18 months, and only recently back on dilantin." Tr. 183-84.

On November 19, 2008, Plaintiff was examined by neurologist Bhashar Mohsen, M.D., who noted that Plaintiff began having seizures at the age of six; that when Plaintiff was young, "he used to have generalized tonic-clonic seizures"; that currently, Plaintiff reported that his "seizures have changed, become more spacey, unresponsive, followed by postictal confusion"; that Plaintiff reported that his seizures "are still frequent, having three per week, and recently decreased to one per month"; that Plaintiff was currently taking Dilantin; that Plaintiff complained of headaches, which began after

a car accident five years ago; that Plaintiff had a "seven year history of restless leg without significant relief"; that Dr. Mohsen's impressions were of generalized epilepsy, tension headaches with a chronic daily headache, neck pain "with cervicogenic headache," and restless legs; and that Dr. Mohsen prescribed Neurontin, Topamax, and Fioricet with Codeine for "breakthrough headache[s]." Tr. 195-96.

On November 19, 2008, Dr. Mohsen also noted that Plaintiff's constitutional, eyes, respiratory, cardiovascular, gastrointestinal, genitourinary, skin, and "Endo/Heme/Allergies" systems were negative; that Plaintiff had neck pain; that Plaintiff had chest pain; that Plaintiff was "[n]egative for palpitations, orthopnea, claudication, leg swelling and PND"; that Plaintiff was "[p]ositive for myalgias" and "[n]egative for back pain, joint pain and falls"; that Plaintiff's neurological system was "[p]ositive for seizures, loss of consciousness and headaches" and "[n]egative for dizziness, tingling, tremors, sensory change, focal weakness and weakness"; and that Plaintiff's psychiatric/behavioral system was "[n]egative for depression, suicidal ideas, hallucinations, memory loss and substance abuse" and Plaintiff "[w]as not nervous/anxious and [did] not have insomnia." Tr. 193-94. Dr. Mohsen also reported that Plaintiff was "oriented"; that an exam of Plaintiff's head was "[n]ormocephalic and atraumatic"; that Plaintiff had normal range of motion, "no edema and no tenderness"; that neurologically, Plaintiff presented as alert and oriented, with normal reflexes, no atrophy, no tremor, no cranial nerve deficit, normal muscle tone, normal coordination and gait, and "display[ed] no seizure activity"; and that Plaintiff "ha[d] a normal mood and affect." Tr. 194.

Dr. Mohsen saw Plaintiff for a neurology followup appointment on February 9, 2009. Dr. Mohsen reported that Plaintiff said that he had "at least three breakthrough seizures since last visit"; that "[t]here [wa]s a question about compliance with Lamictal and topamax but [Plaintiff] says he is

taking the phenytion as prescribed"; that Plaintiff was "awake, oriented times three, [and] follow[ed] multistep commands"; that Plaintiff's gait was steady, his coordination normal, and his reflexes symmetric; that Dr. Mohsen "would like him to do a six hour EEG . . . [and] x-ray of the C-spine"; and that Dr. Mohsen planned to "restart" Plaintiff on Topamax, start Plaintiff on Mobic, and continue Plaintiff's phenytoin and Neurotin. Tr. 201-203.

### III.
### LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity ("RFC"). Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of

production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is

enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022. See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations

by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722

F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## IV.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff alleged that he was disabled due to seizures and poor circulation. At the hearing, Plaintiff testified that he had migraine headaches and that he had trouble understanding directions when he worked. The ALJ found that Plaintiff had the severe, medically determinable impairments

of epilepsy and a full scale IQ of 75 (borderline intellectual functioning); that Plaintiff did not have a mental impairment that precludes his working outside the limits of his borderline intellectual functioning; and that, as a result of his borderline intellectual functioning, Plaintiff was limited to simple repetitive work activity. The ALJ further found that Plaintiff's medically determinable impairments could reasonably be expected to produce some of the symptoms which he alleged but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible; that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; that Plaintiff had the RFC to perform a full range of work at all exertion levels; and that Plaintiff was limited to simple repetitive work activity, no work at unprotected heights, no operation of motor vehicles, and no exposure to hazardous and dangerous machinery and substances. The ALJ further found that Plaintiff had no past relevant work, but that there were jobs, existing in substantial numbers in the national economy, which Plaintiff could perform. As such, the ALJ found that Plaintiff was not disabled.

Plaintiff alleges that the decision of the ALJ is not supported by substantial evidence because the ALJ discredited Plaintiff's testimony regarding the frequency of Plaintiff's seizures and the impact of those seizures on Plaintiff's ability to work. Plaintiff further alleges that the ALJ's decision is not supported by substantial evidence because the hypothetical question which the ALJ posed to the VE was flawed. Plaintiff also contends that the ALJ's decision is not supported by substantial evidence because the ALJ did not consider evidence of Plaintiff's low I.Q., depression, and memory problems when determining whether Plaintiff had an acceptable reason for failing to follow prescribed treatment.

**A.     Plaintiff's Credibility:**

It is the purview and duty of the ALJ to make express credibility determinations. As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Guillams, 393 F.3d at 801; Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as also more fully set forth above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Wheeler, 224 F.3d at 896 n.3; Reynolds, 82 F.3d at 258; Montgomery, 69 F.3d at 275.  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F. 3d 963, 966 (8th Cir. 1996).  In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).

Plaintiff in the matter under consideration testified that he "usually" experienced two or three seizures per week; that he felt "real shaky, and just like real dry, thirsty, and my head will be pounding" for "up to three days" after a seizure; that a migraine headache following a seizure lasts "from a day to two or three days"; and that he experienced migraine headaches "[t]wo to three times a week." Tr. 225-26. The ALJ found Plaintiff's allegations as to the frequency and effects of his

seizures not credible.  The ALJ also discredited Plaintiff's allegations regarding, among other things, complaints regarding the severity of his migraine headaches, his alleged lower back pain, and his alleged mental impairments.  For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered that no objective medical evidence of record establishes that Plaintiff's seizures were as frequent or their effects as prolonged as Plaintiff alleged. Tr. 20.  While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996), the absence of an objective medical basis to support the degree of Plaintiff's subjective complaints is an important factor in evaluating the credibility of the testimony and the complaints. See Russell v. Sullivan, 950 F.3d 542, 545 (8th Cir. 1991); Edwards v. Secretary of Health and Human Services, 809 F.3d 506, 508 (8th Cir. 1987).  The ALJ considered that "very few seizures [were] actually reported" by Plaintiff to his treating sources; the record reflects that in November 2005, Plaintiff reported having a seizure three weeks earlier, after not taking medication for years; that in November 2005, Plaintiff reported that after the age of thirteen he had seizures once a month or "maybe every other month"; that, only in May 2005, does the record reflect that Plaintiff reported having two seizures in one week, until December 2006; that in December 2006, Plaintiff gave a history of having seizures every other day; that, when Plaintiff presented in the emergency room in March 2006, he did not mention seizures; that, in July 2006, Plaintiff reported that his seizures were controlled with medication; and, that, in May 2007, no seizure was noted when Plaintiff was seen for follow-up in regard to seizures. Tr. 20.  Although Plaintiff's EEG report of June 6, 2005 noted an "[a]bnormal EEG consistent [with a] possible seizure disorder," neither this test nor any other

of Plaintiff's medical or laboratory tests indicate the frequency with which Plaintiff experiences seizures. Indeed, no medical opinion supports Plaintiff's allegations as to the frequency of his seizures. Dr. Choudhary, who saw Plaintiff only once, stated in response to an interrogatory, that the frequency of Plaintiff's seizures was "[v]ariable maybe once a month or every other month." Tr. 94. As noted by the ALJ, however, Dr. Choudhary "simply cited [Plaintiff's] report of frequency of seizures in completing the form," as neither Dr. Choudhary's treatment notes nor any objective evidence supports his opinion that Plaintiff suffered a seizure once a month or every other month. Tr. 17. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on [the claimant's] subjective complaints rather than on objective medical evidence."). Even if the ALJ had accepted Dr. Choudhary's report that Plaintiff suffered a seizure once a month or every other month, that frequency would be insufficient for Plaintiff to meet Listing 11.03, which, as explained by the ALJ, requires "a nonconvulsive epilepsy documented by detailed description of a typical seizure pattern, including all associated phenomena, occurring more frequently than once weekly, in spite of at least 3 months of prescribed treatment." Tr. 13. Further, Dr. Pearson's reporting in May 2007 that Plaintiff was having two seizures a week was based on Plaintiff's self reporting. As noted by the ALJ, when Dr. Pearson made this report he had seen Plaintiff only four times in the past eighteen months and had only recently, placed Plaintiff on medication for seizures. Thus, the court finds that the ALJ's findings regarding the lack of evidence to support Plaintiff's testimony regarding the frequency and the duration of his seizures is supported by substantial evidence.

Second, the ALJ considered that Plaintiff's reports regarding the frequency of his seizures had been inconsistent. Tr. 20. In July 2006, Plaintiff reported to Dr. Brenner that *his seizures were*

*"controlled"* by his medication. Tr. 86. In November 2006, Plaintiff reported to Nurse Whitaker that he had *a seizure three weeks earlier*, but that he had not taken seizure medication for two years. Tr. 108. In December 2006, Plaintiff reported to Texas County Memorial Hospital staff that he had *seizures every other day*, but that he had not taken any medication for two months. Tr. 188. In November 2007, Plaintiff reported to Dr. Choudhary that he experienced *a seizure only every month or every other month even without medication*. Tr. 96. In November 2008, Plaintiff reported to Dr. Mohsen that his seizures had "*recently decreased to one per month*" and that he was taking Dilantin. Tr. 195. In February 2009, Plaintiff reported to Dr. Mohsen that he had had "*at least three breakthrough seizures* since [his] last visit." Tr. 201. The only time the record establishes that Plaintiff *reported* experiencing seizures as frequently as once a week was during periods when Plaintiff was either not taking medication or had just recently started back on medication. Conditions which can be controlled by treatment are not disabling. See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling);Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. The court finds that the ALJ properly considered Plaintiff's inconsistent reports as to the frequency of his seizures when discrediting Plaintiff. The court further finds that the ALJ's decision, in this regard, is supported by substantial evidence.

Third, upon discrediting the statements Plaintiff made to Dr. Choudhary regarding the frequency of Plaintiff's seizures the ALJ noted that Dr. Choudhary's report, in this regard, was inconsistent with Dr. Choudhary's own findings. Tr. 16-17. The ALJ further considered that Dr.

Choudhary reported that Plaintiff was awake, alert, and well oriented, had fluent speech, intact comprehension, full muscle strength, and normal gait, and that he had a normal CT scan of the head. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate the record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). As such, the court finds that the ALJ's decision in this regard is supported by substantial evidence and that it is consistent with the case law and Regulations.

Fourth, the ALJ considered Plaintiff's history of non-compliance with his medication. Plaintiff's medical records during his incarceration reflect that *Plaintiff did not take his medication on several occasions*. Tr. 18. Plaintiff's records from the years following his incarceration also indicate *significant periods of noncompliance with medications*. Tr. 96, 91, 108, 188-89, 201-03.

The record establishes that Plaintiff failed to keep at least two scheduled appointments. Tr. 109, 92. On November 7, 2006, Nurse Whitaker reported that Plaintiff had an "abnormal EEG this summer *but never followed up*." Tr. 108. Failure to follow prescribed medical treatment is inconsistent with complaints of disabling conditions. See Eichelberger, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment is inconsistent with complaints of disabling pain). "Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of 'the rationality to decide whether to continue treatment or medication.'" Pate-Fires v. Astrue, 564 F.3d 935, 946 (8th Cir. 2009) (citing Zeitz v. Sec'y of Health and Human Servs., 726 F.Supp. 343, 349 (D. Mass. 1989)). In Plaintiff's case, however, he testified that he did not always get his prescriptions filled or keep appointments because, among other reasons, he had no transportation and because he just wanted to sleep. Additionally, as noted by the ALJ, Plaintiff did not have treatment for an alleged mental impairment. Furthermore, his intellectual functioning level was diagnosed as borderline. Under such circumstances, Plaintiff's level of intellectual functioning, depression, and memory problems did not necessarily excuse his failure to follow prescribed treatment. Moreover, as noted by the ALJ, Plaintiff was on Medicaid since he left prison. In any case, to the extent the ALJ erred in regard to his failure to consider certain factors when noting that Plaintiff was non compliant, such a deficiency does not require that the ALJ's decision be set aside because the ALJ's ultimate finding that Plaintiff is not disabled is supported by substantial evidence. See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir.2006) (citing Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003)). Moreover,

an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Moore ex rel. Moore v. Barnhart, 413 F.3d718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). The court finds that the ALJ properly considered Plaintiff's non compliance and that the ALJ's decision, in this regard, is supported by substantial evidence.[2]

Fifth, records reflect that Plaintiff's epilepsy was well-controlled during the periods when he consistently took his medication. Tr. 15-18. Plaintiff reported to Dr. Mohsen that his seizures had *"recently decreased to once a month" when he was taking Dilantin* and reported to Dr. Brenner that his seizure disorder was "*controlled at present with medications.*" Tr. 195-96, 86. As stated above, medical conditions which can be controlled by medication cannot be the basis for a finding of disability. See Estes, 275 F.3d at 725; Roth v. Shalala 45 F.3d 279, 282 (8th Cir. 1995).

Sixth, the ALJ considered that Plaintiff failed to consistently seek medical treatment. Tr. 15-18. Dr. Pearson reported that he had seen Plaintiff *only four times in eighteen months*, even through

---

[2]     Plaintiff cites Mendez v. Barnhart, 439 F.3rd 360, 362 (7th Cir. 2006), in support of his argument that the ALJ failed to consider his level of intellectual functioning in regard to his noncompliance with prescribed treatment. The court in Mendez did not find that an I.Q. falling within the borderline intellectual functioning range in itself constituted a reasonable justification for a claimant's failure to follow prescribed medical treatment. Rather, the court's finding in Mendez was based on the facts that the claimant had borderline retardation, with I.Q. scores falling between 68 and 71; that she suffered from major depression for which she took anti-psychotic medication on and off, pursued psychiatric treatment on and off, was once hospitalized, and once placed on suicide watch; and that she had difficulty walking. Mendez, 439 F.3rd at 360-61.

Plaintiff's only treatment for a psychiatric disorder, depression, occurred more than fifteen years prior to the ALJ's decision; he did not seek treatment for a psychiatric illness since his alleged disability onset date; Plaintiff is not borderline retarded but rather has borderline intellectual functioning, with an I.Q. score significantly higher than the highest of the Mendez plaintiff's scores; and, as reported by Dr. Brenner, Plaintiff had no difficulty "keeping up an adequate work pace" in the past. Tr. 89, 86. As such, Mendez is distinguishable from the matter under consideration.

Plaintiff was complaining of weekly or twice-weekly seizures. Tr. 183. Even through Dr. Brenner suggested Plaintiff seek antidepressant medication and counseling, *Plaintiff apparently never sought any treatment for the depression she diagnosed*. Tr. 89-90. In regard to Plaintiff's alleged mental impairments, the ALJ considered that Plaintiff had not sought psychiatric treatment or medication. As noted by the ALJ, Plaintiff's failure to seek regular treatment could suggest that his symptoms were less severe than he alleged. See Rautio v. Bowen, 862 F. 2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling pain). In some circumstances, inadequate financial resources may explain a plaintiff's failure to seek medical treatment. See Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). The ALJ considered, however, that Plaintiff had substantial resources to obtain medical treatment and medication; that Plaintiff testified that he had been on Medicaid since leaving prison; and that his smoking habit suggested Plaintiff had some available income. Even assuming that Plaintiff's financial resources were insufficient, failure to seek treatment offered to indigents detracts from a claim that a claimant did not seek medical treatment because of inadequate financial resources. See Riggins, 177 F.3d at 693. The court finds that the ALJ properly considered Plaintiff's failure to seek consistent or frequent medical treatment and that his decision, in this regard, is supported by substantial evidence.

Seventh, the ALJ considered Plaintiff's poor work history as a factor detracting from his credibility. Tr. 20. An ALJ may discount a claimant's credibility based upon his poor work record. Ownbey v. Sullivan, 5 F.3d 342, 345 (8th Cir. 1993). See also Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). In the matter under consideration,

Plaintiff reported to Dr. Brenner that his longest-held job was for two and a half years as a mechanic and that he had not worked for the past two years. Tr. 85.

Eighth, the ALJ considered that SSI would provide Plaintiff with a larger income than he had ever earned independently; that the highest earnings which Plaintiff had posted was $1,610; and that a cash income in excess of what Plaintiff usually reported earning could motivate Plaintiff to exaggerate his symptoms. Tr. 20. An ALJ may discount a claimant's subjective complaints for, among other reasons, that she appeared to be motivated to qualify for disability benefits. See Dodd v. Sullivan, 963 F.2d 171, 172 (8th Cir. 1992). The court finds that the ALJ's decision, in this regard, is supported by substantial evidence and that it is consistent with the Regulations and case law.

Ninth, the ALJ considered that Plaintiff's "drug seeking behavior" during his March 2, 2006 examination by Nurse Whitaker, his history of alcohol abuse, and his felony conviction and subsequent parole violations detracted from Plaintiff's credibility. Tr. 20. See Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995) (observing that claimant's "drug-seeking behavior further discredits her allegations of disabling pain"). As such, the court finds that the ALJ's decision in this regard is supported by substantial evidence and that it is consistent with the case law and Regulations.

Tenth, the ALJ considered that Plaintiff attended his children's school events; that he was able to go shopping and play with his dogs; that he occasionally saw friends; that he had custody of his children every other weekend; and that he did basic household chores. Tr. 18. While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints.

Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792 (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities, including visiting neighbors, cooking, doing laundry, and attending church, were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). The court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit his complaints of debilitating pain. The court further finds that substantial evidence supports the ALJ's decision in this regard.

Eleventh, in regard to Plaintiff's allegation of lower back pain, the ALJ considered that a lumbar x-ray was normal; that there was no evidence of severe persistent muscle spasms or muscle atrophy; and that there was no evidence of significant loss of range of motion or strength. In regard to Plaintiff's allegation of headaches, the ALJ considered that Plaintiff complained of headaches on an intermittent basis; that tomography of the head was normal; that he had no vascular or neurological abnormalities; and that neurological examinations did not reveal significant abnormalities or deficits which could be attributed to migraines. Tr. 18. See Jones v. Chater, 86

F.3d 823, 826 (8th Cir. 1996) (holding that the absence of an objective medical basis to support the degree of a claimant's subjective complaints is an important factor in evaluating the credibility of the testimony and the complaints. See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991); Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987). The court finds that the ALJ's decision, in this regard, is supported by substantial evidence.

Twelfth, with regard to Plaintiff's depression, the court notes that Plaintiff did not list a mental impairment on his disability report. See Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994) (holding that it was significant that the plaintiff did not allege a disabling mental disorder in her application for benefits). An ALJ has no obligation to consider alleged impairments not presented at the time of the application for benefits and not offered at the hearing as a basis of disability. See Sullins v. Shalala, 25 F.3d 601, 605 (8th Cir. 1994); Brockman v. Sullivan, 987 F.2d 1344 (8th Cir. 1993). In any case, the ALJ did consider Plaintiff's allegation of depression and considered that, although Dr. Pearson noted that Plaintiff appeared "depressed" on several occasions, the only record of a specific diagnosis of Major Depressive Disorder was by Dr. Brenner at a one-time examination of Plaintiff requested by Plaintiff's counsel. Dr. Brenner reported that Plaintiff "does appear to be depressed, *particularly in reaction to a recent marital separation*." Tr. 89-90 (emphasis added). To the extent that Plaintiff's depression was related to his marital separation, situational depression is not disabling. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations). Moreover, records of November 19, 2008, state that Plaintiff was "*[n]egative for depression*," "[w]as not nervous/anxious," and "ha[d] *normal mood and affect*." Tr. 194 (emphasis added).

Thirteenth, the court notes that no treating physician ever stated that Plaintiff was disabled. A record which contains no physician opinion of disability detracts from claimant's subjective complaints. See Edwards, 809 F.2d at 508; Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981).

Fourteenth, the court notes that the record as a whole contains additional inconsistencies. "[S]ubjective complaints of pain cannot be disregarded solely because there is no supporting medical evidence, but they can be discounted if the ALJ finds inconsistencies in the record as a whole." Zeiler v. Barnhart 384 F.3d 932, 936 (8th Cir. 2004) (citing Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997)). At the June 20, 2007 hearing, Plaintiff testified that he "no longer drank" and *had not had alcohol for two years*. Tr. 224. However, Plaintiff reported to Dr. Brenner on July 6, 2006, which was less than a year before he testified before the ALJ, that he "*typically will have about two beers a week*." At the time of his marital separation (which appears to have occurred one or two months before Dr. Brenner's evaluation, Plaintiff *had a "binge"* during which he consumed "about 24 beers." Tr. 86-87. On November 19, 2008, Plaintiff claimed a "seven year history of restless leg *without significant relief*," (Tr. 195-196), however, on November 15, 2005, Dr. Pearson noted that Plaintiff's restless leg syndrome was "*settling down quite nicely* with the Requip." Tr. 103. Dr. Brenner's records reflect that Plaintiff reported his "primary impediments to working [were] leg and back pain, frequent migraines, frequent illness in the past two years and depression." Tr. 86-87. Plaintiff did not list any of those conditions when he applied for SSI. Moreover, Plaintiff listed *neither his seizures nor his poor circulation,* the disabilities alleged in his application for SSI, *among his primary impediments to working* when asked by Dr. Brenner.

In summation, the court finds that the ALJ's decision regarding Plaintiff's credibility, including Plaintiff's allegations of the severity and frequency of his seizures and the alleged effect of his mental status on his compliance, is supported by substantial evidence.

**B.       Hypothetical to the Vocational Expert:**

As stated above, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertion levels, and that Plaintiff was limited to simple repetitive work activity, no work at unprotected heights, no operation of motor vehicles, and no exposure to hazardous and dangerous machinery and substances. Contrary to Plaintiff's assertion, as discussed above, the ALJ did take Plaintiff's level of intellectual functioning into account when determining his RFC as Plaintiff was limited to simple repetitive work activity. Also, despite Plaintiff's assertion to the contrary, the ALJ considered Plaintiff's seizure disorder as Plaintiff was restricted from working at unprotected heights, from operating motor vehicles, and from exposure to hazardous and dangerous machinery and substances. The ALJ noted that the restrictions which he placed on Plaintiff were "typical seizure restrictions." Tr. 328. The court finds that the ALJ's determination of Plaintiff's RFC is based on substantial evidence. See Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (holding that when determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments).

Consistent with the Regulations and case law, the ALJ posed a hypothetical to a VE which incorporated Plaintiff's borderline intellectual functioning. Lucy v. Chater, 115 F.3d 905, 908 (8th Cir. 1997) ("[B]orderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment that must be considered by a vocational expert."). Also, the ALJ incorporated Plaintiff's seizure disorder in the hypothetical which he posed to the VE, to the

extent the ALJ found it limiting. The ALJ posed a hypothetical to the VE which included the above stated limitations and assumed that the hypothetical person shared Plaintiff's age and education,[3] and had no past relevant work. An ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobana, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). As such, the court finds that the hypothetical posed to the VE, upon which the ALJ relied, was based on substantial evidence and that it was consistent with the case law and Regulations.

The VE testified that an individual with the limitations described in the hypothetical and who is the same age and had the same education as Plaintiff would be able to perform a number of "unskilled, simple, repetitive" jobs which are available in substantial numbers in the state and national economy. The VE further testified that these jobs included "lodging room cleaners or maids," "office cleaners who work in the evening vacuuming and taking out small cans of trash in an office," as well as "those at a light level of work such as small parts and small products," and "some simple hand

_____

[3]     Plaintiff suggests that the ALJ did not consider Plaintiff's age when determining whether there was work which he could perform.

packaging jobs that are not related to conveyors or production assembly line, but are performed at a table or bench." The VE stated that these jobs were at a "light level of work" and that "if we get into medium level work we run into more of an aspect of power tools and other machinery, hazards, and things like that being involved." Tr. 228-29.

Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). As such, the court finds that the ALJ properly relied on the testimony of the VE and that the ALJ's decision, in this regard is supported by substantial evidence.

In response to a hypothetical posed by Plaintiff's attorney, the VE testified that there would be no work available for a person who had two to three seizures a week, and who, after having a seizure, had to go to a dark room and lay in bed. Tr. 230. The hypothetical posed by Plaintiff's attorney did not reflect the limitations which the ALJ found credible. Thus, despite Plaintiff's assertion to the contrary, the ALJ was not required to rely on the hypothetical posed by Plaintiff's attorney. See Gilbert, 175 F.3d at 604.

As the VE testified that there is work in the economy which a person with Plaintiff's limitations can perform, the court finds that the ALJ properly relied on the VE's testimony and that the ALJ's decision, in this regard, is supported by substantial evidence. See Robson, 526 F.3d at 392; Wingert, 894 F.2d at 298.

# V.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED that** the relief sought by Plaintiff in Complaint and Brief in Support of Complaint is **DENIED**; Docs. 1, 14

**IT IS FINALLY ORDERED** that a separate Judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this <u>4th</u> day of February, 2011.